ALONZO W. LAWRENCE AND JAMES SIMPSON, PLAINTIFFS-RE-
SPONDENTS, v. BAUER PUBLISHING & PRINTING LTD., A
CORPORATION, KURT CHRISTOPHER BAUER, JEFFREY
LANCE BAUER AND PATSY BONTEMPO, DEFENDANTS-AP-
PELLANTS.

Argued November 16, 1981—Decided April 27, 1982.

452

454

*J. Roger Conant* argued the cause for appellants (*Conant & McCreedy*, attorneys).

*Thomas J. Cafferty* argued the cause for *amici curiae* New Jersey Press Association and The Reporters Committee for Freedom of the Press (*Seiffert, Frisch, McGimpsey & Cafferty*, attorneys; *Thomas J. Cafferty* and *A. F. McGimpsey*, on the brief).

*Paul R. Williams, Jr.*, argued the cause for respondents.

The opinion of the Court was delivered by

CLIFFORD, J.

This litigation results from the publication in the Rahway News-Record of two articles on the topic of a petition drive in the City of Rahway. Plaintiffs seek damages based on the alleged defamatory nature of both articles. Defendants, the newspaper's publisher, editor and a reporter, assert the defense of truth and the qualified First Amendment privilege protecting newspapers from liability for defamatory statements concerning public figures. The trial court ruled that plaintiff Lawrence was a public figure as set forth in *Gertz v. Welch*, 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789 (1974), and dismissed Lawrence's claim because of insufficient evidence of defendants' actual

malice. The jury returned a verdict in favor of plaintiff Simpson. Lawrence's post-trial motion for a new trial was granted. The Appellate Division affirmed the judgment in favor of Simpson and the order granting Lawrence a new trial. 176 *N.J.Super.* 378 (1981).

We agree with so much of the determination below as holds both articles to be defamatory as a matter of law. However, we find both plaintiffs to be public figures for the purposes of this controversy. Therefore, since there is no evidence of actual malice, we vacate the order awarding plaintiff Lawrence a new trial and reverse the judgment in favor of plaintiff Simpson.

I

In 1974 the Rahway Taxpayers Association led by plaintiffs Alonzo Lawrence, the group's president, and James Simpson, its secretary-treasurer, conducted a campaign in opposition to a municipal appropriation for the construction of a new firehouse. The Association, a citizens group made up of Rahway taxpayers, circulated petitions among Rahway's registered voters in an attempt to force a public referendum on the appropriation issue. Petitions containing over 5,000 signatures were submitted by plaintiffs to the Rahway City Clerk in late December 1974.

On or about January 7, 1975 the Rahway News Record received a telephone call from City Business Administrator Joseph Hartnett, a sometime source of news concerning City affairs. Hartnett spoke first to the editor, defendant Kurt Bauer, and then to reporter Patsy Bontempo, who had been assigned to cover the controversy surrounding the firehouse appropriation. Although the substance of Hartnett's conversations with Bauer and Bontempo is disputed, the three parties to the conversations agree that Hartnett said at least this: that there were "irregularities" in some of the signatures on the petitions filed by the Association; that the City Prosecutor, Theodore Romankow, was conducting an investigation of the petitions to determine whether there were incidents of forgery or false swearing in connec-

tion with the signatures; and that included in the petitions being investigated were those containing signatures witnessed personally by Lawrence and Simpson.

As part of its ongoing coverage of the firehouse controversy and as a result of the conversations referred to above, the Rahway News-Record published the first of two articles that plaintiffs allege are defamatory. On January 9, 1975 the following headline spanned the entire eight columns of the Rahway News-Record's front page: "City Attorney rules association petitions improper; forgery charges may loom for Lawrence, Simpson." The accompanying article stated in pertinent part:

> In separate actions city attorney Alan Karcher ruled the petitions filed by the officials of the Rahway Taxpayers Association are improper and attorney Theodore J. Romankow was asked to take action by city officials against association leaders because of "irregularities" in the petitions.
>
> The Rahway News-Record learned Mr. Romankow was empowered to handle a case against Alonzo W. Lawrence, president of the Association, and James Simpson, the group's secretary-treasurer.
>
> The case would be based on charges that forgery was involved in the gathering of approximately 5,000 signatures which the two men filed with city clerk Robert W. Schrof on December 27, the News-Record was told.
>
> In connection with this the men would also be charged with false swearing of oaths and affidavits, it was asserted.

In response to plaintiffs' request that the News-Record retract the allegations contained in the above-quoted article, the following headline appeared on the front page of the April 17, 1975 edition of the newspaper: "News-Record asked to retract article on firehouse battle." As acknowledged at trial by defendants, the accompanying article was not a retraction of the earlier article. Rather, it defended the earlier story as an accurate account of the facts as made known to the News-Record by "a source in the [City] administration." The April 17th article emphasized that the first article contained no accusations of guilt but merely the assertion that "city officials were turning the petitions over to the local prosecutor, which in fact they did, to investigate allegations of forgery and false swearing of oaths." The article described the Association's sponsorship of the petition drive, and reported that following an investigation by the municipal prosecutor, the petitions were referred to the

Union County prosecutor's office "for further investigations of the charges."

In conclusion the newspaper stated:

The News-Record did not and does not seek to harm Messrs. Lawrence and Simpson or to in any way injure their good names. The pair of their own choosing publicly associated themselves and their organization with the petitions.

The gentlemen, thus, are in fact associated with the petitions and the petitions are in fact the subject of an investigation for allegations of forgery and false swearing of oaths.

This did not and does not mean, nor was it ever said to mean, the gentlemen are guilty of anything.

Following the publication of the second article plaintiffs instituted this libel action against the Bauer Publishing and Printing Company, owner of the Rahway News-Record; Kurt Bauer, the paper's editor; Jeffrey Bauer, the corporation's president; and Patsy Bontempo, reporter and author of the January Ninth article.[1]

At the outset of the trial plaintiffs moved for a ruling that the two articles in question were libelous as a matter of law and that the defense of truth should be stricken from the case. The court granted both motions inasmuch as the defendants were unprepared to prove that plaintiffs were guilty of the offenses attributed to them by the articles, namely, forgery and false swearing.

At the close of the case the court ruled that plaintiff Lawrence was a public figure for the purposes of the firehouse dispute. It granted defendants' motion to dismiss Lawrence's claim on the ground that he had failed to present clear and convincing evidence of actual malice on the part of defendants. Observing that plaintiff Simpson did not have the same degree

---

[1] Slightly more than one year later plaintiffs filed an amended complaint naming Joseph Hartnett as an additional defendant. The trial court granted Hartnett's motion for summary judgment based upon the one year statutory limitations period for libel actions, *N.J.S.A.* 2A:14-3. 143 *N.J.Super.* 387 (Law Div.1976). The Appellate Division reversed and remanded. 154 *N.J.Super.* 271 (1977). We reinstated the trial court's order of dismissal. 78 *N.J.* 371 (1979).

of access to the media as did Lawrence, the court ruled that Simpson was a private figure. Thus, the jury was charged only with respect to Simpson's claim against defendants. The jury returned a verdict in favor of Simpson against all defendants except the reporter, Patsy Bontempo, and awarded damages in the amount of $22,500.[2]

Following the verdict plaintiff Lawrence requested the court to reconsider its earlier dismissal of his case. Persuaded that the record contained sufficient evidence to raise a jury question as to whether defendants had acted with actual malice, the trial court reversed itself and granted Lawrence's motion for a new trial.

Defendants appealed, asserting as reversible error the trial court's rulings striking the defense of truth and holding the articles libelous as a matter of law. Defendants also challenge the ruling that Simpson was not a public figure and the granting of Lawrence's motion for a new trial. Finally, defendants question the language of the jury charge on damages, an issue we do not reach because of our conclusion that both plaintiffs are public figures as set forth in *Gertz v. Welch,* 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789 (1974).

The Appellate Division upheld the rulings of the trial court and affirmed the judgment in Simpson's favor and the award of a new trial to Lawrence. *Lawrence v. Bauer Publishing & Printing Ltd.,* 176 *N.J.Super.* 378 (1980). We granted defendants' motion for leave to appeal, 87 *N.J.* 331 (1981).

## II

We consider first the defendants' contention that the trial court erred in ruling the two articles defamatory as a matter of

---

[2]The original jury verdict awarded $18,000 in money damages and instructed defendants to publish a full apology and retraction in the News-Record. Following an explanation by the court on the scope of remedies available, the jury redeliberated and returned with the $22,500 figure. The court's action in permitting the further deliberation is not challenged here.

law. The effect of that ruling was to remove from the jury the question of whether the articles could reasonably be interpreted as possessing a nondefamatory meaning. The court based its ruling on the tendency of the articles to subject the plaintiffs to public contempt or ridicule. See *Garven v. Finch*, 97 *N.J.L.* 329 (E.& A.1922). Defendants argue that the existence of a defamatory meaning was a question of fact for the jury because the articles did not accuse plaintiffs of any criminal conduct. That approach reveals defendants' confusion as to the meaning of the lower court's use of the term "libel *per se.*"

The terms "libel *per se*" and "libel *per quod*" have long been used to differentiate between writings defamatory on their face and those defamatory solely in the light of extrinsic facts. *Herrmann v. Newark Morning Ledger Co.*, 48 *N.J.Super.* 420, 443 (App.Div.1958). A determination of whether certain language is defamatory on its face rests within the power of the trial court. *Leers v. Green*, 24 *N.J.* 239, 255 (1957). Only when the court finds the words to be capable of both a defamatory and a nondefamatory meaning does a question of fact arise for the jury to decide. *Herrmann, supra,* 48 *N.J.Super.* at 430. Therefore, the trial court's ruling that the two articles were libelous *per se* meant the court found as a matter of law that the statements were not reasonably susceptible of a nondefamatory interpretation.

To establish the defamatory nature of the articles it was not necessary for plaintiffs to prove that defendants had accused them of the commission of a crime. Words that clearly "sound to the disreputation" of an individual are defamatory on their face. *Shaw v. Bender*, 90 *N.J.L.* 147 (E.& A.1917). The unambiguous import of the two articles is to cast doubt on the reputations of plaintiffs, Lawrence and Simpson. The statement that plaintiffs "may be" charged with criminal conduct diminishes their standing in the community and is little different from an assertion that plaintiffs have actually been charged with certain crimes. Hence the court correctly ruled that the

articles were libelous *per se, i.e.,* not susceptible of a nondefamatory interpretation.

## III

■ Defendants assert that the trial court erred in granting plaintiffs' motion to strike truth as a defense. Under the common law, truth, if established, exonerates the publisher of a defamatory statement of fact. See *Medico v. Time, Inc.,* 643 F. 2d 134, 137 (3d Cir. 1981); *Restatement (Second) of Torts* § 581A (1977). For the defense to apply, however, the truth must be as broad as the defamatory imputation or "sting" of the statement. See *Rogozinski v. Airstream by Angell, Inc.,* 152 *N.J.Super.* 133, 146–47 (Law Div.1977), modified, 164 *N.J.Super.* 465 (App.Div.1979); W. Prosser, *Law of Torts* § 116 (4th ed. 1971). See also *Medico, supra,* 643 *F.*2d at 137; *Rogers v. Courier Post Co.,* 2 *N.J.* 393, 401 (1949).

After hearing argument on plaintiffs' motion to strike the defense of truth, the trial court determined that defendants' publication of the statements that plaintiffs were suspected of and being investigated for committing the crimes of forgery and false swearing imputed to plaintiffs the very commission of those crimes. Therefore, the court ruled that defendants could not assert the justification of truth unless they were prepared to prove not only that the reported investigation was conducted or that "forgery charges loomed," but also that plaintiffs did in fact commit forgery and false swearing. See *Restatement (Second) of Torts* § 581A, comment c, at 236 (1977). When defense counsel conceded that he was unprepared to prove that plaintiffs had in fact committed the criminal offenses imputed to plaintiffs, the trial court ordered the defense of truth stricken from the case.

The Appellate Division affirmed the trial court's determination:

> We are, therefore, entirely satisfied that a publisher of a statement which is defamatory by suggestion or insinuation, must, in order to present an adequate defense, prove more than that the article was literally true. That the informa-

tion was received from another source is not enough. To sufficiently develop the defense of truth under the facts of this case, defendants must show that plaintiffs had in fact committed the offenses or that they had been formally charged with criminal conduct or that police or county prosecuting authorities had announced an official investigation of plaintiffs for the offenses described in the articles. [176 *N.J.Super.* at 389–90 (footnote and citation omitted).] [3]

There is considerable authority for the proposition that the fact that defendants accurately reported information obtained from another source will not relieve them of liability. Under that analysis the defense of truth does not refer to the truthful republication of a defamatory statement but to the truth of the statement's contents. *Restatement (Second) of Torts* § 578, comment b, at 235–36 (1977). Thus, if defendant published that a third person stated that plaintiff has committed a crime, it is no justification that the third party did in fact make that statement. *Rogers, supra,* 2 *N.J.* at 401–02. Defendant must prove that in fact plaintiff committed the crime. See L. Eldridge, *Law of Defamation* § 67 at 331 (1978). Similarly, a statement that criminal charges were imminent would be truthful only if such charges were demonstrably impending.

The trial court viewed the statement in this case as imputing to plaintiffs the crimes of forgery and false swearing and therefore imposed on defendants the burden of proving that plaintiffs had actually committed those crimes. A more literal reading of the headline indicates that the correct interpretation may have been that charges of forgery and false swearing were forthcoming. Whether the "truth" defense should be framed in terms of proof that defendants committed the crimes referred to in the article or simply that charges concerning those charges might "loom" is a provocative question we need not decide today, given our holding that plaintiffs were public figures who

---

[3]The final portion of the quoted statement refers to the privilege of "fair report," a qualified privilege that permits the republication of official statements issued by police department heads and county prosecutors in investigations in progress or completed by them. See *N.J.S.A.* 2A:43–1. This privilege was not seriously asserted by defendants since the source of their information was not one covered in the statute.

have not demonstrated the requisite malicious libel by defendants necessary to sustain a libel judgment.

## IV

Ultimately, the successful invocation of a constitutional privilege in this case is controlled by whether defendants fall into the category of public or private figures. It is well settled that in defamation actions the existence *vel non* of privilege is basically a question of law for the court's determination. See, *e.g., Barbetta Agency, Inc. v. Evening News Publishing Co.*, 135 N.J.Super. 214, 218 (App.Div.1975); *Sokolay v. Edlin*, 65 N.J.Super. 112, 124 (App.Div.1961). In the case before us, because the news media's right to speak freely and to disseminate newsworthy information about public figures is intricately related to First Amendment guarantees, the public figure question is one involving a limited constitutional privilege and is therefore a matter of law for the trial court to decide. See *Rebozo v. Washington Post Co.*, 637 F.2d 375, 379 (5th Cir. 1981); *Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1247 (5th Cir. 1980); *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859, 861–62 (5th Cir. 1978); *Meeropol v. Nizer*, 560 F.2d 1061, 1066 & n.6 (2d Cir. 1977). In the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that the First Amendment guarantees of free speech and press give rise to a limited constitutional privilege in the case of certain publications. Under *New York Times* a newspaper is protected from liability for publishing a defamatory report about the official conduct of a public official unless there is clear and convincing evidence that the newspaper published with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 725–26, 11 L.Ed.2d at 706. A demonstration of actual malice is also necessary in cases where the plaintiff is not a public *official* but can be identified as a public *figure, Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), either for all purposes or for

the purposes of only the events upon which the defamatory publication was based. *Gertz, supra,* 418 *U.S.* at 351, 94 *S.Ct.* at 3012, 41 *L.Ed.*2d at 812. Thus, the existence of the privilege is controlled by the status of the person defamed.

*Gertz* refrains from establishing specific criteria against which a plaintiff's status can be measured to determine whether or not he is a public figure. Rather in instances where the plaintiff is not a public figure for all purposes, *Gertz* calls for a case-by-case examination "looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation," 418 *U.S.* at 352, 94 *S.Ct.* at 3013, 41 *L.Ed.*2d at 812. Important factors that led the Court to conclude that the *Gertz* plaintiff was not a public figure included plaintiff's lack of any calculated relationship with the press and the fact that he neither "thrust himself into the vortex of this public issue, nor [engaged] the public's attention in an attempt to influence its outcome." *Id.*

With *Gertz* as a framework for our analysis we turn to a consideration of whether plaintiffs are public or private figures. Plainly, these plaintiffs are not public figures for all purposes; neither possesses the requisite "pervasive fame or notoriety." *Id.* Therefore, we confine our examination to whether either was a public figure with regard only to the firehouse appropriation controversy and the petition drive they spearheaded to force a public referendum on the matter.

*Lawrence*

The undisputed facts concerning Lawrence's participation in the firehouse controversy justify the conclusion that he voluntarily thrust himself into the forefront of that dispute. Lawrence, the founder and president of the Association, regularly attended city council meetings and spoke out against what his organization believed was an excessive appropriation for the proposed city firehouse. At one such meeting he was one of only five people permitted by the city council to speak on this issue on behalf of the public. He also attended an open public

meeting concerning the appropriation ordinance and there again spoke out against the appropriation.

When his cause appeared to be defeated by the mayor and city council, Lawrence initiated the petition drive through the Taxpayer's Association, with the goal of obtaining a sufficient number of signatures to force a public referendum. Lawrence was one of five Association officers and members whose names appeared on every petition sheet circulated. In circulating the petitions Lawrence personally canvassed Rahway neighborhoods house to house, explaining to residents the purpose of the petition drive and obtaining their signatures on the petition sheets. He visited at least fifty homes and collected at least two hundred signatures. Consequently, there is substantial credible evidence to support the lower courts' determination that Lawrence voluntarily injected himself into the forefront of the public controversy surrounding the firehouse appropriation issue, which gave rise to the defamation for which he seeks to recover. Moreover, Lawrence's obvious purpose in thrusting himself into a major role in the public controversy was to influence the resolution of the issue involved. See *Wolston v. Reader's Digest Ass'n, Inc.*, 443 *U.S.* 157, 168, 99 *S.Ct.* 2701, 2707, 61 *L.Ed.2d* 450, 460–61 (1979); *Gertz, supra*, 418 *U.S.* at 341, 94 *S.Ct.* at 3007, 41 *L.Ed.2d* at 812.

In addition, Lawrence received extensive exposure in the local press. On several occasions prior to the January Ninth article he provided press releases to the Rahway newspaper. Moreover, the trial court determined that in the few weeks prior to the publication of the January Ninth article, Lawrence's name had been mentioned and his most recent activities discussed in approximately twenty published articles (some in headlines) reporting on the firehouse dispute. Lawrence therefore "enjoy[ed] significantly greater access to the channels of effective communication and hence [had] a more realistic opportunity to counteract false statements than private individuals enjoy." *Gertz, supra*, 418 *U.S.* at 344, 94 *S.Ct.* at 3009, 41 *L.Ed.2d* at 808. This access to the media, taken together with Lawrence's active

and significant participation in the public controversy giving rise to the defamation, leads us to agree with the determination of the lower courts that as a matter of law, Lawrence is a public figure for the limited purposes involved here.

*Simpson*

■ The record discloses that as secretary-treasurer of the Rahway Taxpayers Association, Simpson actively participated in the petition drive. He was one of the five-member committee of petitioners whose names appeared on every petition sheet circulated by the Association. Simpson personally collected approximately 250 petition signatures as a result of his door-to-door efforts, and on at least one occasion he wrote a letter to the editor on the issue of the firehouse appropriation. The day the petitions were filed, Simpson notified the Rahway News-Record and requested the presence of a photographer at the delivery. The resulting photograph portraying Simpson, among others, turning over the petitions, was published in the December 31, 1974 issue of the News-Record.

Although the factors delineating Simpson's status are less compelling than those relating to Lawrence, we hold that Simpson is also a public figure for the limited purposes of the firehouse appropriation and petition controversies. This conclusion is derived from our close scrutiny of Simpson's activities during the course of the firehouse controversy and the subsequent submission of the petitions. Both lower courts, perhaps because of the much more extensive activity of Lawrence, failed to perceive that Simpson was similarly in the forefront of the controversy. The proper determination of public figure status involves a measuring of the degree of plaintiff's participation in a particular activity, not a relative comparison of the involvement of two separate participants. The analysis focuses on Simpson's relationship to the controversy as a whole. Although his participation was not as extensive as Lawrence's, it far exceeded the role of a private figure.

## V

After the jury returned the verdict for plaintiff Simpson, the trial court granted plaintiff Lawrence's motion for a new trial. In so doing the court reversed its own prior dismissal of Lawrence's cause of action. The Appellate Division affirmed without comment the order for a new trial. 176 *N.J.Super.* at 396.

As stated previously, in order to meet the "actual malice" test of *New York Times v. Sullivan, supra,* a public figure must prove with convincing clarity that the defamatory statements were published by the defendant with knowledge of their falsity or reckless disregard of whether they were true or false. 376 *U.S.* at 279–80, 84 *S.Ct.* at 725–26, 11 *L.Ed.2d* at 706. "Reckless disregard" in this context refers to the publishing of defamatory statements with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana,* 379 *U.S.* 64, 74, 85 *S.Ct.* 209, 215, 13 *L.Ed.2d* 125, 133 (1964). In *St. Amant v. Thompson,* 390 *U.S.* 727, 88 *S.Ct.* 1323, 20 *L.Ed.2d* 262 (1968), the Court emphasized the stringent evidentiary standard necessary to prove recklessness, stating:

> [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. [390 *U.S.* at 731, 88 *S.Ct.* at 1325, 20 *L.Ed.2d* at 267.][4]

Put differently, the recklessness in publishing material of obviously doubtful veracity must approach the level of publishing a "knowing, calculated falsehood." *Ryan v. Brooks,* 634 *F.2d* 726, 733 (4th Cir. 1980).

---

[4]In *St. Amant, supra,* Justice White reflected on examples of reckless conduct that might be inferred from circumstantial evidence, including publication of a completely fabricated story, a publication based entirely on an unverified anonymous telephone call, or publication where there are obvious reasons to doubt the veracity of the information reported. 390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.2d* at 268.

In light of this stringent standard we have carefully examined the record below to determine whether the evidence at trial was sufficient to present a jury question as to actual malice. That examination reveals that there was insufficient evidence of actual malice toward either plaintiff. For that reason the order granting Lawrence a new trial cannot stand.

Although a belief in the truth of the matter published is insufficient to sustain the defense of truth, it is relevant in determining whether the defendant showed actual malice in regard to the truth or falsity of the publication. See *Restatement (Second) of Torts* § 581A, comment h, at 237 (1977). Here, defendants honestly believed that the concededly misleading statements published in the two articles were true. Their misconceptions arose primarily from their conversation with Hartnett in which he told them that the petitions were under investigation for possible evidence of false swearing and forgery. Having been informed by Hartnett that petitions witnessed by both Lawrence and Simpson were among those being examined, defendants thought it was a reasonably certain implication that any such investigation would center around the activities of Lawrence and Simpson, who were known by the newspaper to be the key figures in circulating and filing the petitions.

Lawrence's post-trial argument that persuaded the trial court to reverse its earlier dismissal of his case was essentially nothing more than this: based upon the information the defendants received from Hartnett and City Prosecutor Romankow prior to the publication of the two articles, they *should have* known that the articles were false, or they at least *should have* doubted their accuracy. But the liability question is not one of reasonableness when public figures and media defendants are involved. Rather, the focus of the "actual malice" inquiry is on a defendant's *attitude* toward the truth or falsity of the publication, *Dupler v. Mansfield Journal Co., Inc.,* 64 *Ohio St.*2d 116, 413 *N.E.*2d 1187 (1980); on his *subjective* awareness of its probable

falsity, *Rosanova v. Playboy, supra,* 580 *F.*2d at 862; and his *actual* doubts as to its accuracy, *Ryan v. Brooks, supra,* 634 *F.*2d at 732. *Cf. Herbert v. Lando,* 441 *U.S.* 153, 199–200, 99 *S.Ct.* 1635, 1660–1661, 60 *L.Ed.*2d 115, 148–49 (Stewart, J., dissenting) (1979) ("actual malice" in the *New York Times v. Sullivan* sense has nothing to do with hostility or ill will; rather it concerns publisher's "state of knowledge of the falsity of what he published, not at all upon his motivation in publishing it * * *.").

▓▓▓ Neither "errors of interpretation of judgment" nor "misconceptions" are sufficient to create a jury issue of actual malice under the *New York Times* standard. See *Time, Inc. v. Pape,* 401 *U.S.* 279, 290, 91 *S.Ct.* 633, 639, 28 *L.Ed.*2d 45, 53 (1971); *Ryan v. Brooks, supra,* 634 *F.*2d at 733. The Supreme Court has held that "if 'the freedoms of expression are to have the "breathing space" that they "need * * * to survive," ' misstatements of this kind must have the protection of the First and Fourteenth Amendments." *Time, Inc. v. Pape, supra,* 401 *U.S.* at 292, 91 *S.Ct.* at 640, 28 *L.Ed.*2d at 54 (quoting *New York Times, supra,* 376 *U.S.* at 271–72, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701). "[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant, supra,* 390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.*2d at 267.

There is not "clear and convincing" evidence that defendants *knew* that the defamatory publications were false, or that they *actually* doubted their accuracy. See *Ryan v. Brooks, supra,* 634 *F.*2d at 732. Rather, as originally concluded by the trial court, defendants published a careless and perhaps irresponsible account of the information received concerning the scope of the City Attorney's investigation. But the evidence in the record is "constitutionally insufficient" to present a jury question of actual malice. See *New York Times, supra,* 376 *U.S.* at 288, 84 *S.Ct.* at 730, 11 *L.Ed.*2d at 711; *Ryan v. Brooks, supra,* 634 *F.*2d at 735.

## VI

The articles published by defendants are defamatory as a matter of law. It is unnecessary for us to decide the issue of truth as a defense. The Court having determined that both parties are public figures for the limited purposes of the firehouse appropriation and the petition controversy, defendants are protected by a qualified First Amendment privilege unless there is clear and convincing evidence that they acted with actual malice toward plaintiffs. Whatever the evidence of malice, it is insufficient to present a jury question on the issue.

Accordingly, we vacate the order granting plaintiff Lawrence a new trial and reinstate the judgment in favor of defendants. We reverse the judgment in favor of plaintiff Simpson. and enter judgment for defendants.

SCHREIBER, J., dissenting.

Two highly motivated senior citizens are left without redress for libelous publications holding them up to contempt and ridicule in the community in which they have lived for many years.[1] This is the result of their sincere attempt to participate in local government. One, Simpson, is brought down by the Court's unnecessarily expansive interpretation of what constitutes a "public figure." The other, Lawrence, loses his claim because a publisher who charged him with forgery is found by this Court not to have acted with a reckless disregard of the truth, irrespective of the fact that a jury could have found that the publisher had no basis for the libelous statement. I dissent from both holdings.

## I

The First Amendment right of freedom of the press does not immunize a publisher from liability for printing and disseminating libelous statements. When the First Amendment was advo-

---

[1]See appendix for reprint of initial article.

cated and adopted it was the settled view that the press would continue to be responsible for defamatory comments and the ensuing injury inflicted on the individual. *See generally State v. Allen*, 73 *N.J.* 132, 172–74 (1977) (Schreiber, J., concurring) (pointing out that the Framers' concept of freedom of the press was centered upon prior restraint and that common law libel was to remain untouched). *See also Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 381–84, 94 *S.Ct.* 2997, 3027–28, 41 *L.Ed.2d* 789, 822, 829–30 (White, J., dissenting). Though subsequent construction of the First Amendment was not so limited, the cause of action for defamation, at least where the statement involved false factual material, remained unimpaired. *See Rabban*, "The First Amendment in Its Forgotten Years," 90 *Yale L.J.* 514 (1981).

The Supreme Court modified this principle in 1964 in *New York Times v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.2d* 686 (1964). In balancing the press's constitutional right to report on public affairs against the damage to the reputation of a public official, the Court limited recovery to those situations where the public official proved either that the publisher knew the statement was false at the time it was published or printed the article in reckless disregard for the truth. Insofar as a public official was concerned, this was considered to be an appropriate accommodation between the interest in an uninhibited press and the official's need for redress of libelous statements.

In the companion cases, *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker*, 388 *U.S.* 130, 87 *S.Ct.* 1975, 18 *L.Ed. 2d* 1094 (1967), the *New York Times* principle was applied to "public figures" as well as public officials. The application was made without defining the term. It was not until *Gertz v. Welch*,[2] 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.2d* 789 (1974), that

---

[2]Prior to *Gertz*, a plurality of the Supreme Court in *Rosenbloom v. Metromedia, Inc.*, 403 *U.S.* 29, 91 *S.Ct.* 1811, 29 *L.Ed.2d* 296 (1971), advocated that the determinant should be whether the statements related to a public issue. This rationale was based on the idea that public issues should be

the Court laid down the guidelines. In that case a monthly publication, *American Opinion*, printed defamatory remarks charging a well-known Chicago lawyer with participation in a Communist campaign against the police. This lawyer had represented the family of a young man who had been killed by a Chicago policeman only in a civil action, not in the policeman's criminal trial. The Supreme Court rejected the notion that the lawyer was a public figure.

The Court justified the application of the *New York Times* rule to public officials and public figures for two reasons. These individuals usually enjoyed significantly greater access to the news media and therefore had a more realistic opportunity to counteract false statements. More importantly, the public official voluntarily sought and accepted the public office and had to accept the "necessary consequences." As for public figures, they were a limited group who had invited attention and comment.

The *Gertz* decision defined the public figure as (a) those who have "assumed roles of especial prominence in the affairs of society," and (b) those who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. We are particularly concerned in this case with the second category since the defendant has conceded that neither Lawrence nor Simpson had achieved generally "especial prominence in the affairs of society" leading to "such pervasive fame or notoriety," so as to become "a public figure for all purposes and in all contexts." *Id.* at 351, 94 *S.Ct.* at 3012, 41 *L.Ed.*2d at 812. The Court warned that it "would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes." *Id.* at 352, 94 *S.Ct.* at 3013, 41 *L.Ed.*2d at 812.

---

debated freely, widely and openly, thus recognizing that this might well permit sharp attacks on government officials.

*Gertz* prescribed four characteristics of the second group. First, the individual had to voluntarily inject himself into the controversy. Second, the controversy had to be a *public* one. Third, *by virtue of* the public controversy, the individual became a public figure for a limited range of issues. Fourth, the person had to assume *"special"* prominence in the resolution of the public question. *Id.* at 351, 94 *S.Ct.* at 3012, 41 *L.Ed.2d* at 812. The Court found that the plaintiff did not fit this pattern. He had not thrust himself into the vortex of the public issue, a Communist campaign against the police. Nor had he engaged the public's attention in an attempt to influence "its outcome." He had not become a public figure because of the public controversy.

After *Gertz* the Supreme Court continued to adhere strictly to these four characteristics. In *Time, Inc. v. Firestone*, 424 *U.S.* 448, 96 *S.Ct.* 958, 47 *L.Ed.2d* 154 (1976), Mary Firestone, the wife of Russel Firestone, scion of one of America's wealthier industrial families, obtained a libel judgment against the publisher of *Time* magazine for its inaccurate report of the divorce judgment following a lengthy bitter matrimonial proceeding in Palm Beach County, Florida. The case received substantial newspaper publicity and Mrs. Firestone had called several press conferences during the trial. The Supreme Court upheld the judgment and rejected the contention that she was a public figure. It reasoned that "[d]issolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in *Gertz,* even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public." *Id.* at 454, 96 *S.Ct.* at 965, 47 *L.Ed.2d* at 163. It observed that she was compelled to go to court in the divorce action and concluded that "[s]he assumed no 'special prominence in the resolution of public questions.'" *Id.* at 454–55, 96 *S.Ct.* at 965, 47 *L.Ed.2d* at 163.

The Supreme Court next considered the public figure concept in two cases decided the same day, *Hutchinson v. Proxmire*, 443 *U.S.* 111, 99 *S.Ct.* 2675, 61 *L.Ed.2d* 411 (1979), and *Wolston v.*

*Reader's Digest Ass'n*, 443 *U.S.* 157, 99 *S.Ct.* 2701, 61 *L.Ed.*2d
450 (1979). In *Hutchinson*, Senator Proxmire was sued for
defamation arising out of his "Golden Fleece" award, which he
granted with attendant publicity to those involved in supposedly
wasteful governmental expenditures. One such case concerned
funding a study by Hutchinson of emotional behavior of certain
animals. The Court rejected the notion that Hutchinson had
"the regular and continuing access to the media [prior to the
award] that is one of the accoutrements of having become a
public figure." *Id.* at 136, 99 *S.Ct.* at 2688, 61 *L.Ed.*2d at 432.
The publicity created by the defamatory statement could not be
used to make Hutchinson into a "public figure."

The second case involved Ilya Wolston who sued for defama-
tory statements made about him in a book published by the
Reader's Digest Association. The Supreme Court reversed low-
er court rulings that he was a public figure. A special federal
grand jury had been conducting a major investigation into the
activities of Soviet intelligence agents in the United States.
When Wolston did not respond to a grand jury subpoena, at
least seven news stories appeared in New York and Washington
newspapers. Subsequently, Wolston pleaded guilty to contempt
for his failure to appear and the newspapers reported this event.
In all, during the six-week period between his non-appearance
and sentencing, fifteen stories were printed in Washington and
New York papers. Thereafter the publicity subsided.

The Supreme Court observed that the mere fact Wolston
voluntarily chose not to appear before the grand jury was not
decisive. It emphasized that the focus must be on the "nature
and extent of an individual's participation in the particular
controversy giving rise to the defamation." *Id.* at 167, 99 *S.Ct.*
at 2707, 61 *L.Ed.*2d at 460, quoting *Gertz v. Welch, supra,* 418
*U.S.* at 352, 94 *S.Ct.* at 3013, 41 *L.Ed.*2d at 812. The Court
significantly observed:

A private individual is not automatically transformed into a public figure just by
becoming involved in or associated with a matter that attracts public atten-

tion.... A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times.* [*Id.*]

The Court went on to state that Wolston's failure to respond to the subpoena was not "calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue." *Id.* at 168, 99 *S.Ct.* at 2707, 61 *L.Ed.*2d at 460.

These cases point rather clearly in the direction that there must be strict compliance with all the requisites defined in *Gertz* before the handicap of becoming a public figure is imposed. When these criteria are applied to Simpson, he falls far short of attaining the status of a public figure. Two guidelines were met. The controversy involved the proposed municipal expenditure of an additional $100,000 for a firehouse. This unquestionably was a public controversy. Second, Simpson had voluntarily injected himself into it. However, he did not by virtue of that controversy become a public figure for the limited range of issues involved. Nor did he assume *special* prominence in the resolution of the firehouse question. The trial court's conclusion that Simpson was not a public figure was based on these two latter elements.[3]

At the time of trial, Simpson was 68 years old and had lived in Rahway for 45 years. He had retired in 1973 from his job as a production foreman in a book publishing plant. His participation in local affairs had been confined to the local First Aid organization and the Rahway Taxpayers' Association, a civic group formed to act as a watchdog over municipal expenditures. Simpson had written two letters to the editor of the *Rahway News-Record* on the firehouse controversy, one arguing against the increased expenditures and the other responding to a critic

---

[3]Contrary to the majority's conjecture that the lower court's evaluation of Simpson was deficient because Simpson's participation was dwarfed in comparison with that of Lawrence (ante, at 464), the trial court analyzed Simpson's situation "as though [he was] the only plaintiff in the case."

of the first letter. Of the thirteen articles related solely to the firehouse controversy submitted into evidence at the trial, only one of them mentioned Simpson. That article was accompanied by a picture depicting the transmittal of the petitions by members of the Taxpayers' Association to the City Clerk. Simpson was part of this group photograph. Though Simpson had spoken at monthly Town Council meetings, as had other citizens, the record does not disclose on how many, if any, occasions he spoke on the firehouse issue. He obtained between 250 and 275 signatures on petitions seeking a public referendum on the question. The solicitation was carried on by about 20 others who ultimately obtained approximately 5,000 signatures. His name appeared on the petitions as one of a committee of five, it being a statutory requirement that petitions be in that form. He had also joined in the lawsuit against the City, which had rejected the petitions on the ground that a public referendum was not available to review an ordinance appropriating funds.

One could reasonably conclude, as did the trial court, that Simpson had not risen to that *special* prominence by virtue of his activities on the firehouse controversy. He had not sought to draw attention to himself to influence the public. He was part of a team of citizens who attempted to have the public vote on the issues. Though his role may have been somewhat more noticeable than others, he had not attained a special prominence because of the local publicity prior to the defamatory publications. The trial court's comments are worthy of repetition:

> He was not in the vortex of this fight. He did not get the newspaper publicity. He acted more or less as a private citizen in attending meetings, making an occasional dispute. There's a dispute in the number of speeches he made. He talked ... occasionally at least and I do not think he meets the standards. So the Court will hold that Mr. Simpson, for the purposes of this litigation, is not a public figure.

Important policy reasons justify this result. As noted previously, the *New York Times* rule exposing public officials and public figures to defamatory statements reflected an accommo-

dation between reducing the inhibition on freedom of the press and the individual's right to redress for defamation. Yet, this case demonstrates that an added dimension should be considered, the individual's right to free speech. This Court today recognizes that:

> [r]ecent developments in the law of libel and defamation have been directed toward preventing people from being discouraged in the full and free exercise of their First Amendment rights with respect to the conduct of their government. [*Kotlikoff v. Community News,* 89 *N.J.* 62 (1982)]

It has been said that "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer,* 383 *U.S.* 75, 85, 86 *S.Ct.* 669, 675, 15 *L.Ed.2d* 597, 605 (1966). The First Amendment protects an individual's activity in speaking in public forums, *Hague v. CIO,* 307 *U.S.* 496, 515–16, 59 *S.Ct.* 954, 963–64, 83 *L.Ed.* 1423, 1436–37 (1939), and in canvassing neighborhoods of private homes, *Hynes v. Mayor of Oradell,* 425 *U.S.* 610, 616–17, 96 *S.Ct.* 1755, 1758–59, 48 *L.Ed.2d* 243, 250–51 (1976). *See also id.* at 624–25, 96 *S.Ct.* at 1762–63, 48 *L.Ed.2d* at 255–56 (Brennan, J., concurring). These twin First Amendment rights insure that people seeking to communicate with the public have two readily available channels of public communication.

A freely expansive notion of a public figure in the context of this case defeats the major underlying purpose of the *New York Times* principle. It will throttle rather than foster public debate and criticism. The chilling effect on the individual's right of free speech is real. This case illustrates what may occur. After the libelous newspaper article appeared, Simpson stopped attending and speaking out at municipal council meetings. Lawrence, too, had second thoughts about his activity, though he decided to continue. Citizen participation in local governmental affairs is to be encouraged, not discouraged. Broadly construing "public figures" to embrace townspeople whose only notoriety relates to debate over a local governmental controversy of the type exemplified in this case is counterproductive.

Professor Eldredge, in his treatise *The Law of Defamation* (1978), has graphically demonstrated the point:

The Courts are in a most critical and delicate area in considering what persons, who voluntarily inject themselves into public controversies and take positions on matters which are clearly "public issues," should be subject to the *New York Times* standard. A broad extension of this standard could be an instrument to destroy the very freedom of speech in whose name the extension is demanded. One of the great needs in contemporary America is to encourage more good people to participate in government, to speak out, and stand up and be counted, on important questions. How often do leading lawyers, doctors, bankers, business men, raise their voices of complaint and critical discussion of a public issue around their luncheon tables, and how seldom are they willing to say the same thing publicly and give the general public the guidance which is needed? Far too often, even our bar associations show timidity in coming out forthrightly on matters in which they could provide great guidance. Far too often, the citizen, of some stature in the community who is willing to be quoted in a newspaper or be interviewed on radio or television on any important controversial question, seems to be a lone wolf howling in the wilderness. Such people may or may not "seek" the spotlight of the stage of public opinion but they generally get into it by saying what they deeply believe must be said. Suppose the private citizen criticizes the Board of Magistrates and charges corruption in the disposition of gambling cases in the city. If there can be unleashed against him a stream of false defamation under the protection of *New York Times*, his voice will soon be silenced, or made ineffective. And seeing this result, who will dare to speak out again in the same vein? Unbridled defamation concerning matters of public concern was a tool the Nazis used in pre-World War II Germany to destroy important men and render useless what they said, the men whose messages desperately needed to be heeded. How much is freedom of speech really advanced by a constitutional rule which says: "Once you speak out on a question of public interest you become fair game for the John Birch Society, for every venomous newspaper editor, and for everybody else who wants to destroy you and the power of what you say?"

I fully realize that this argument cuts both ways. But the only justification for *New York Times*, in its drastic cutting down of the scope of actionable defamation, (and its destruction within its scope of the precious right of public vindication of one's good name) is that it is necessary in order to *encourage* people to speak out on important questions. If, in fact, the privilege will in some situations encourage people to speak out and, in others, discourage them, then only the net gain for free speech should be weighed against the value of reputation, in striking the balance on the scale of constitutional law. We cannot determine the balance, as some writers seem to do, by merely putting the value-weight of a good reputation on one side of the scale and the value-weight of completely uninhibited free speech on the other. That smacks too much of the butcher putting his thumb on the scale. [*Id.* at 283–85; (footnotes omitted)]

## II

I also agree with the trial court that there was sufficient evidence with respect to Lawrence's claim warranting submission of the issue of defendant's "actual malice" to the jury. *New York Times* defined actual malice to be either the publication of a defamatory statement actually known to be false or the publication in reckless disregard of its truth or falsity.

*St. Amant v. Thompson,* 390 *U.S.* 727, 88 *S.Ct.* 1323, 20 *L.Ed.* 2d 262 (1968), upon which the majority so heavily relies, does not draw a bright line between what may or may not constitute a reckless disregard for truth. Rather, it recognizes that no simple definition exists for "reckless disregard." "Reckless disregard . . . cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case by case adjudication. . . ." *Id.* at 730, 88 *S.Ct.* at 1325, 20 *L.Ed.* 2d at 267.

The majority has stressed a part of the *St. Amant* opinion that indicates that reckless conduct is not measured by a reasonably prudent man standard and that there must be sufficient evidence to demonstrate "that the defendant in fact entertained serious doubts as to the truth of his publication." (*Ante* at 466, quoting 390 *U.S.* at 731, 88 *S.Ct.* at 1325, 20 *L.Ed.*2d at 267). If this were the only message in *St. Amant,* I would be constrained to agree with the majority's conclusion. However, *St. Amant* also states:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.*2d at 267–68]

This passage imposes on the publisher an element of good faith. Thus, where a publisher acts based on an unverified anonymous telephone call even though he may in fact not entertain serious doubts about the truth, he may be found to have acted with a reckless disregard of the truth. The factual setting in *St. Amant* is instructive. Thompson, a deputy sheriff, sued St. Amant, a political candidate, for quoting in a campaign speech statements made about him by J. D. Albin, a member of a local union. Thompson could prove that the statements were defamatory and false, but could not show that St. Amant knew of their falsity. Thus, the issue was whether St. Amant made his speech with a reckless disregard of the truth. The Court decided that St. Amant's reliance upon Albin was not reckless under the circumstances. St. Amant had relied on other occasions upon information received from Albin without incident. These prior dealings sufficed to give St. Amant confidence in Albin, so that his repetition of Albin's statements was not a reckless disregard of the truth.

*St. Amant* does not stand for the proposition that libel defendants have immunity so long as they testify that they believed what they wrote was true. The courts will examine the circumstances and decide whether the individual who should have entertained serious doubts about the truth, recklessly went ahead. This is the interpretation that several federal circuit courts have attributed to *St. Amant.*

In *Carson v. Allied News Co.*, 529 *F.2d* 206 (7th Cir. 1976), the defendant had published a story indicating that Johnny Carson, the well-known late-night entertainer, had moved the site of his television show so as to be near the woman who had caused the breakup of his first marriage. The facts showed that the woman in question not only did not live in California but that Carson did not meet her until after he and his first wife had separated. The court found that the reporter had no basis for much of his story, attributing the published statements to his

imagination, and consequently found recklessness possible—regardless of whether the reporter actually believed the import of his story to be truthful.

In *Guam Federation of Teachers v. Ysrael*, 492 *F.2d* 438 (7th Cir.), *cert.* denied, 419 *U.S.* 872, 95 *S.Ct.* 132, 42 *L.Ed.2d* 111 (1974), the court held there was a jury issue as to whether the statements were made with "malice." The court wrote:

> He repeatedly admitted that he did not know whether what he said was true. He repeatedly admitted that he did nothing, or almost nothing, to verify his charges. As to most of his statements, he repeatedly admitted that he knew of no facts to support them; he either relied upon unspecified rumor or upon nothing at all. He simply asserted that he believed that what he said was true. Such an assertion is not enough to support a directed verdict in his favor. If it were, mere swearing could, as a matter of law, defeat any action to which the *New York Times* principles are applicable. See *St. Amant v. Thompson*, 1968, 390 *U.S.* 727, 732, 88 *S.Ct.* 1323 [1326], 20 *L.Ed.2d* 262. [*Id.* at 439]

In *Goldwater v. Ginzberg*, 414 *F.2d* 324 (2d Cir. 1969), the defendant argued that he should not be liable for defamatory remarks made about Senator Goldwater's psychological stability because he based his observations on other sources. While the court did find that Ginzberg did not merely repeat these statements but added certain innuendos to them, it also emphasized that lack of adequate investigation has been an important fact in proving "reckless disregard for the truth." Since the article did not contain "hot news," the Second Circuit thought that the seriousness of the charges called for a thorough investigation, yet the evidence revealed "only the careless utilization of slipshod and sketchy investigative techniques. . . . " *Id.* at 339. *See also Vandenberg v. Newsweek, Inc.*, 441 *F.2d* 378, 380 (5th Cir. 1971) (stating "[t]he Supreme Court has held that actual malice may be inferred when the investigation for a story which is not 'hot news' was grossly inadequate in the circumstances").

A belief by the publisher that otherwise defamatory charges are true does not preclude a finding of liability. Jurors should be allowed to consider all the evidence concerning defendant's

acts in deliberating upon whether the defendant published with actual malice. Did the publisher act in good faith? Was there a source of the information? Was that source reasonably, from the publisher's standpoint, relied upon? The *St. Amant* standard, as I understand it, will in no way trench upon the freedom of a responsible press.

Factual determinations had to be made in this case in order to ascertain the circumstances under which the publisher acted. There was a conflict in the testimony. The majority opinion accepts Bauer's version of the information related to him by Hartnett. However, Hartnett testified that he had at no time stated or intimated that Lawrence had forged any signatures on or falsely sworn to the propriety of the signatures on the petitions. At trial Hartnett went to great pains to clarify his conversations with the publisher. He maintained repeatedly that he had never linked either Lawrence or Simpson with the forgeries. In fact, he denied ever linking Lawrence to the charge of false swearing. If Hartnett is believed, then Bauer, who asserted Hartnett was the source of the newspaper's information, had no basis for implying that Lawrence had been guilty of forgery or false swearing in connection with the petitions. Despite this, Bauer printed the defamatory material relating Lawrence to an alleged forgery. It is questionable whether Bauer acted in good faith under these circumstances. Publication could certainly be held by a jury to fall within the scope of a reckless disregard for the truth. The trial court acknowledged as much when it granted Lawrence a new trial.

I would affirm.

482

RAHWAY

News Record

New Jersey's Oldest Weekly Newspaper   Established 1822

VOLUME 153 NO. 54          RAHWAY, NEW JERSEY, THURSDAY JANUARY 9, 1973          15 CENTS

*LAWRENCE WARNS MAYOR ON LIBEL*

# City attorney rules association petitions improper; forgery charges may loom for Lawrence, Simpson

In separate actions city attorney Alan Karcher ruled the petitions filed by the officials of the Rahway Taxpayers Association are improper and attorney Theodore J. Romankow was asked to take action by city officials against association leaders because of "irregularities" in the petitions.

The Rahway News-Record learned Mr. Romankow was empowered to handle a case against Alonzo W. Lawrence, president of the association, and James Simpson, the group's secretary-treasurer.

The city's case would be based on charges that forgery was involved in the gathering of approximately 5,000 signatures which the two men filed with city clerk Robert W. Schrof on December 27, The News-Record was told.

In connection with this the men would also be charged with false swearing of oaths and affidavits, it was asserted.

The signatures involved were part of a petition drive launched by members of the group in an attempt to hold a public referendum on an additional $100,000 appropriation for the Main Street firehouse approved by city councilmen at their December 9 session.

Association members feel voters will reject the additional appropriation thus prohibiting the city from both constructing an eight-bay fire headquarters [remainder of paragraph defaced].

In a letter to the city clerk Mr. Karcher said in his opinion, based on a superior court decision in the case of Cuprowski versus the city of Jersey City, the association's petitions are "improper" and "of no force and effect and should be disregarded."

In the ruling it was stated "in the absence of a clear, positive and unambiguous mandate by the legislature, the major-

ity view is that appropriations and budget ordinances or resolutions are not subject to initiative and referendum."

A copy of the attorney's decision was sent by certified mail to Messrs. Lawrence and Simpson by the clerk on January 3.

Meanwhile Mr. Lawrence reacted swiftly and angrily to charges made by mayor Daniel L. Martin and reported in the December 31 issue of The Rahway News-Record.

In that issue the mayor said Mr. Lawrence's constant opposition to accepting firehouse bids since the original low bids of $303,000 received in 1965 was the major cause of the increased costs for the new structure.

Mr. Lawrence accused the mayor of stating a "complete fabrication" on this point. He said the 1965 bids were for a three-bay firehouse while the current estimated cost of $783,013 is for an eight-bay building.

As for the mayor's statement that Mr. Lawrence has been a firehouse foe for the past 11 years, Mr. Lawrence said, "He was in his employ from June 1966 to November 1967 and is well aware that during that period I never opposed the construction of any firehouse."

Mr. Lawrence claimed neither he nor the association ever opposed the construction of a new firehouse but instead their opposition has been to the proposed size and the closing of Seminary Avenue operations.

He called an eight-bay structure "an over a designed building which provides space the housing of all fire equip-

(Continued on page 10)

[Remainder of article will not be reprinted for this publication].

*For vacation in part and reversal in part*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, HANDLER, POLLOCK and O'HERN—6.

*For affirmance*—Justice SCHREIBER—1.