293 N.J. Super. 491 (1994)
681 A.2d 671
DANIEL F. NEWMAN, PLAINTIFF
v.
BRIAN DELAHUNTY, DEFENDANT.
Superior Court of New Jersey, Law Division Ocean County.
Decided August 15, 1994.
*495 Charles Starkey, Toms River, for plaintiff (Starkey, Kelly, Blaney & White).
Brian Delahunty, defendant, pro se.
PISCAL, J.S.C.

I. BACKGROUND
This case poses the question: is it possible to defame an incumbent candidate for Mayor in a political campaign? The answer is yes. The setting is the Brick, Ocean County mayoral campaign of 1989.

II. PROCEDURAL HISTORY
This complaint for defamation was filed on September 24, 1990. Essentially, Daniel F. Newman, hereinafter Mr. Newman, sued Brian Delahunty, hereinafter Mr. Delahunty, and others connected with him. Mr. Newman was mayor and ran for reelection as the Democratic candidate. Mr. Delahunty ran as an independent candidate. The voters chose the Republican candidate on November 7, 1989.
Mr. Newman alleged that the campaign as waged by Mr. Delahunty and his supporters, was concentrated to defeat him. Mr. Delahunty was charged with publishing and communicating numerous defamatory writings. See Appendix.
The six count complaint alleges that the defamatory statements were "made with actual malice, with knowledge that the allegations were untrue, with a reckless disregard of whether the statements were true or not, and with knowledge that the allegations *496 constituted a charge of unlawful conduct on the part of the plaintiff." Each count contained a demand for "judgment against the defendants jointly and severally for punitive damages and costs."
Michael Miller, named as a defendant in the complaint, was never served. The other defendants, "Concerned Citizens For Delahunty" and "Committee To Elect Brian Delahunty", had been ad hoc committees that no longer exist. No service was made on them or the fictitious defendants. Thus, the case proceeded with one plaintiff and one defendant.
On February 18, 1992, Mr. Delahunty filed an answer to the complaint on his own behalf, essentially denying the allegations. On March 25, 1992, a pleading designated "Countersuit" was filed by Mr. Delahunty consisting of five counts alleging malicious conduct/harassment, the making of false statements, delaying his applications before the Planning Board, circulation of a letter alleged to be authorized by the defendant to put him in a false light, and uttering false rumors about the defendant. No jury was requested in either the complaint or the countersuit.
The trial took five and one-half days; then a one day trial as to punitive damages. The plaintiff called eight witnesses and one rebuttal witness. The defendant called six witnesses in addition to himself during the liability phase of the case.

III. POLITICAL CANDIDATES ARE PUBLIC FIGURES
At the outset the Judge raised the question as to whether the parties were to be considered "public figures" as that phrase is used in Lawrence v. Bauer Pub & Print. Ltd. See Lawrence v. Bauer Pub. & Print. Ltd., 89 N.J. 451, 462-463, 446 A.2d 469 (1982) (the successful invocation of a constitutional privilege is controlled by whether defendants fall into the category of public or private figures); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Mr. Newman was willing to stipulate to that status, nonetheless, the *497 Judge, on the basis of plaintiff's position as then incumbent mayor and Mr. Delahunty's position as active candidate in the mayoral race, found each to be a "public figure" for the issues set forth in this case.

IV. THE ELEMENTS OF DEFAMATION
The United States Supreme Court has enumerated the basic principles in New York Times Company v. Sullivan. See New York Times Company, supra, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Court once again recognized the general proposition that "freedom of expression upon public questions is secured by the First Amendment." New York Times Company, supra, 376 U.S. at 269, 84 S.Ct. at 720, 11 L.Ed.2d 686. Furthermore, "the maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." Id. (citing Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 [1931]).
This court is cognizant of the valuable rights at stake and is mindful of this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." See New York Times Company, supra, 376 U.S. at 270, 84 S.Ct. at 721, 11 L.Ed.2d 686 (citing Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 [1949]). However, it was Justice Holmes who recognized that freedom of speech does not give one the right to falsely yell "Fire" in a crowded theater. See Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).
Freedom of speech is a phrase that raised concerns from both poles, i.e. freedom of expression and the right to one's good name.
*498 As was written by Professor Eldredge in his treatise The Law of Defamation (1978):
The Courts are in a most critical and delicate area in
considering what persons, who voluntarily inject themselves into public controversies and take positions on matters which are clearly "public issues," should be subject to the New York Times standard. A broad extension of this standard could be an instrument to destroy the very freedom of speech in whose name the extension is demanded. One of the great needs in contemporary America is to encourage more good people to participate in government, to speak out and stand up and be counted, on important questions.... Unbridled defamation concerning matters of public concern was a tool the Nazis used in pre-World War II Germany to destroy important men and render useless what they said, the men whose messages desperately needed to be heeded....
I fully realize that this argument cuts both ways. But the only justification for New York Times, in its drastic cutting down of the scope of actionable defamation, (and its destruction within its scope of the precious right of public vindication of one's good name) is that it is necessary in order to encourage people to speak out on important questions. If, in fact, the privilege will in some situations encourage people to speak out and, in others, discourage them, then only the net gain for free speech should be weighed against the value of reputation, in striking the balance on the scale of constitutional law.
[Lawrence, 89 N.J. at 477, 446 A.2d 469, (Schreiber, J. dissenting) (citing L. Eldredge, The Law of Defamation (1978)).]
Thus, the familiar standard that "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice, that is with reckless disregard of whether it was false or not," applies to the case at bar. See New York Times Company, 376 U.S. at 279-280, 84 S.Ct. at 726, 11 L.Ed.2d 686.
In New Jersey, it is clear that in actions for public defamation i.e. defamatory statements against a public official involving a matter of legitimate public concern, the plaintiff must prove each of the following five (5) elements by clear and convincing proof:
1) The statements must be defamatory statements of fact.
2) The statements must concern the plaintiff.
3) The plaintiff must prove the defamatory statements were false.
*499 4) The plaintiff must prove the defamatory statements were communicated to persons other than the plaintiff.
5) Plaintiff must prove that defendants communicated the false statements to others with the actual knowledge that it was false or with a reckless disregard of whether it was true or false.
(See Model Civil Jury Charge § 3.11A and cases cited therein).

V. A REVIEW OF THE ALLEGED DEFAMATORY MATERIALS
The alleged defamatory materials will now be scrutinized for these elements. See Appendix A-J. These exhibits may be referred to collectively as "the materials."
The materials consist of the following: first, three editions of "The Bricktown Investigator" (Appendix A-C)[1]; second, five cartoons or caricatures (Appendix E-I); third, two double sided "flyers" or "hand outs" (Appendix D, J). The plaintiff has sustained his burden of proving by clear and convincing evidence each element of defamation with respect to the three editions of "The Brick Investigator", the flyer designated "Where your tax dollar really goes", and the cartoon designated, "Flyer  Fast and Easy." See Appendix A-D, G. The cartoons, with the exception of Appendix G, and the flyer, "Justice for Sale" are protected by the first amendment.

A. AS TO THE BRICKTOWN INVESTIGATOR
The Bricktown Investigator has a newspaper like format consisting of several pages containing some red lettering and some pictures, but basically black print on a white ground. The first of the three editions entered into evidence, Appendix A, headlines on page two "Justice for Sale" in red capital letters. On page three it declares in red capitals that "Newman's Corruption Will Bring *500 Increase in 1990 Taxes" and "Newman's Land Deal Cheats Every Taxpayer in Bricktown". See Appendix A.
"Corruption" is defined as, "the act of an official or fiduciary person who unlawfully and wrongfully uses his station or character to procure some benefit for himself or for another person contrary to duty and the rights of others. See bribe, extortion." Black's Law Dictionary 345 (6th ed. 1990). "Justice For Sale" and "Newman's Land Deal Cheats Every Taxpayer in Bricktown" are not defamatory statements of fact. However, "Newman's Corruption Will Bring Increase in 1990 Taxes" charges Mr. Newman with corruption and is libel per se. See Lawrence, supra, 89 N.J. at 459, 446 A.2d 469 (1982). See also Ward v. Zelikovsky, 136 N.J. 516 (1994) at pg. 526, 643 A.2d 972. (The four recognized categories of slander per se are that the statements impute commission of a crime, contraction of a loathsome disease, occupational incompetence or misconduct and unchastity of a woman). Thus, element one is established.
It is clear that the statements concern Mr. Newman, the incumbent Mayor, so element two is established.
As to element three, falsity of the statements, it is usually as hard to disprove a charge of "corruption" as it is to prove the "malice" element. However, this case presents unusual facts. Mr. Newman denied the charges of "corruption" and "land deals." In support of his denial, he offered into evidence a letter from the State of New Jersey, Commission of Investigation, dated August 27, 1992. There was no objection and it was marked into evidence pursuant to Evid.R. 803(c)(8). The letter indicated the investigation concerning his "activities as Mayor of Brick Township" had been concluded and stated in pertinent part: "There will not be a public hearing or report on this matter. The Commission now considers this inquiry closed." Mr. Newman made no attempt to prove that the whole investigation may have been caused by Mr. Delahunty nor should the court leap to such a conclusion. There has been enough of that in this case.
*501 If "land deals" was a reference to out of state property holdings by Mr. and Mrs. Newman, Mrs. Newman's testimony established that the only out of state property they own is a modest Florida condominium purchased in 1988. Evidence was produced that the funds used for the purchase were from a Home Equity Loan. See P29, 30, 31.
It became clear from the case presented that what Mr. Delahunty meant by "corruption", "land deals" and "justice for sale" was a product of his own malice, a misconstruction of various to him, inexplicable land transactions and a hyperbolic spin on the use of the car provided by the Town for the Mayor's use.
What did Mr. Delahunty have to say about "corruption" and "land deals" when the opportunity arose during his case and when pressed during cross examination? The most serious charge presented was that Arthur Cierzo, the head construction official for Brick Township since 1980, solicited a bribe from Mr. Delahunty when he, his partners and brothers-in-law, Peter Ferro and Anthony Ferro, and their partner, Mr. Richard Carroll, stood outside of the Town Hall after a meeting. Mr. Cierzo was said to approach them and say, "I want a lot (from the Jackob's Farm subdivision?)[2] for my daughter". This was first brought out by Mr. Delahunty asking Mr. Cierzo himself, (subpoenaed by Mr. Delahunty), who denied any such conversation. Later, Anthony Ferro did give Mr. Delahunty some support that the bribe was solicited in their presence. Curiously Peter Ferro who was supposed to be there said nothing of this.
Mr. Delahunty addressed the issue in this fashion. He admitted that P33 (a check to Arthur Cierzo for his mileage on the subpoena) had a legend on it "bag man", a term which he wrote on the check. He still calls Mr. Cierzo "bag man" and dares him to do something about it. This is an example of recklessness from his own lips! And for the first time, Mr. Delahunty says that Mr. Cierzo also asked for plumbing business be sent to Pineland *502 Plumbing (Newman's company). Did this happen? Would one seeking a bribe solicit it in front of four people? Why didn't the testimony of the two witnesses who did testify as to this mesh? From Mr. Delahunty's own testimony the Federal Bureau of Investigation was not impressed with this bribery story, and he refused their request to wear a "wire" to tape Mr. Cierzo. The court places no credence in this bribe story and the feeble last second attempt to tie it to Mr. Newman. No credit is given to this tale of alleged bribery. "Land deals" was a charge against Mr. Newman. What did Mr. Delahunty mean by this? Was it the removal of a drainage pipe from the Poppy Court subdivision? First, no testimony established that Mr. Newman had anything to do or say about this. Second, testimony failed to establish that the removal of this pipe had anything to do with the subsequent drainage problems there. On the contrary, Mark Speir, the construction supervisor on the project, testified that the drainage problem was due to an adjacent subdivision.
Was Mr. Delahunty's source for this information on "land deals" and "corruption" the rumors that Township workers would discuss at Mr. Delahunty's headquarters? No attempt was made to go into any of this material.
Was "land deals" a reference to other Brick Town developments or was it the out of state properties impliedly gained by Mr. Newman in an allegedly ill gotten fashion?[3] Mrs. Newman adequately explained the Florida transaction and no attempt was made to explain any others by the defendant, nor was there any attempt to refute her testimony.
The zoning code enforcement officer, Sean Kinnevy, was called by Mr. Delahunty. He testified that a building known as Parkwood Plaza remained vacant for a long time (whatever that means) but no Code Violations were issued. No link of this was made to Mr. Newman though it is presumed to have happened during his *503 tenure as Mayor. Nor was anything said to indicate any violations existed.
Mr. Kinnevy spoke of a Meadow Run subdivision. Mr. Newman's Pineland Plumbing Co. did work on this job. Some homes were begun without issuance of building permits. However, Mr. Kinnevy said this was common i.e. a builder under construction of a large subdivision would move ahead of his paper work. Eventually all the paper work was straightened out. Again, no direct involvement by Mr. Newman as having intervened at Town Hall or the like was established. Mr. Delahunty's suspicions do not amount to evidence in a court of law!
An example of how Mr. Delahunty thinks is instructive. He marked Exhibits D3 (a deed between Mr. Newman and the Gunthers, Mr. Newman's brother-in-law and member of the Planning Board), D41 (Deed from Anastasiades to Daniel Newman) and testified in summary that he once worked as a title searcher, and that he did title searches on all of the principals involved in this matter (including Mr. Starkey, plaintiff's attorney!). From these deeds and other matters, Mr. Delahunty concluded some kind of "corruption", or dishonest "land deal." Furthermore, he marks a picture D4 which shows pilings sunk on land he says is the property in question in deeds, D3 and D41. How can someone get a permit to erect pilings on what is to him, obviously wetlands he asks? His answer is that this bespeaks corruption on the part of Mayor Newman.
Mr. Gunther was called as a rebuttal witness. He established that he does own the property described in Deeds D3 and D41. He paid for it with a loan from United Savings Bank (P34). He believed he purchased it directly from Anastasiades, that closing was delayed due to "riparian problems." He said that Anastasiades did not want to sell to him (this was not explained any further), and he was unaware that Mr. Newman's name was on a deed in his chain of title. From this Mr. Delahunty concluded "corruption" and "land deal," but the Court finds this is susceptible of a non corrupt interpretation, i.e. the use of Mr. Newman as *504 a "straw man" by Gunther's closing attorney to facilitate the transaction.
Element four, communication (referred to in older cases as the "publication" of the libel to others), was clearly and convincingly proven by just about every witness plaintiff called. Each said he or she received "The Brick Investigator" and was given the flyers by Mr. Delahunty himself or a member of Delahunty's family. There was no testimony as to the exact date of publication or distribution except that it was in the fall of 1989.
Mr. Delahunty, the Ferro brothers and his wife testified that they handed out "The Brick Investigator" and some of the cartoons. The cartoons and flyers were distributed by fax and by hand as several witnesses testified to receiving them and several testified as having handed out or placed them on door knobs of homes. According to the testimony of Mr. Newman and Mr. Peter Ferro, Appendix D ("Where Your Tax Dollar Really Goes") was faxed to Brick Municipal Offices and other business offices.
Delivery of the defamatory material to people who understand that the statement is defamatory is a part of element four. See Restatement (Second) of Torts § 577 cmt. b-c (1977). The witnesses called by Mr. Newman each had received the Brick Investigator and the other materials and each understood the statements in the defamatory sense. Moreover, Mr. Delahunty, Peter Ferro, and Mrs. Delahunty admitted they made wide delivery of the materials.
Therefore element four is proven.
Element five, knowledge that the statements were false or reckless disregard has also been proven in this case. First, as to Mr. Delahunty's mind set, Mr. Newman testified that the first time he was aware of Mr. Delahunty stemmed from a Planning Board meeting in 1988. The meeting room was packed with people who had been informed by Mr. Delahunty that a certain tract of land, the so called "Jackob Farm" tract was about to be rezoned for "shopping centers." Mr. Delahunty, the Ferro brothers *505 and a Richard Carroll were said at various times during the trial to have bought this property or have an option on it or some contingency contract to buy it. Mr. Delahunty's testimony varied from that of Peter Ferro in this regard.
Mr. Newman testified that he had no knowledge of any plan to rezone this property for shopping centers. He indicated this became a very heated planning board meeting because the crowd was fired up about a "shopping center" plan and the Board didn't know what was going on. This property was a constant reference point by witnesses called by each side at trial. Mr. Delahunty and his in-laws had an application before the Board of Adjustment as well as the Planning Board regarding this property. There were stories about it in the papers; Could it be a park site for "Green Acres" money? The site was a source of constant speculation in the local press.
Eventually, Mr. Delahunty's application for this site would be approved by the Planning Board. In fact, it was admitted by Mr. Delahunty that during the late nineteen eighties he made six (6) applications to the Planning Board (one would be withdrawn and resubmitted). All were approved.
Peter Ferro, was called as a witness by Mr. Newman. As to the Jackob's Farm property he said, "Newman took hold of the Board (Planning) and suddenly it was (zoned) commercial."
Herbert Stephens, a man with over forty years in the printing business, was assisting Mr. Delahunty in his campaign and helped him in discussions with a printer. When asked if Mr. Delahunty ever told him how he felt about Dan Newman he said "yes." He then testified, "I could tell there was animosity there", he (Delahunty) intended to "harass him" and Mr. Delahunty also told Mr. Stephens, "I got it out for Dan Newman."
During Mr. Delahunty's case, he called witnesses who were asked questions about the Jackob's Farm property and the hearing before the Planning Board. No one supported a thesis that Mr. Newman had any hidden, improper motives with regard to the *506 property. But all contributed to the concept that Mr. Delahunty was infuriated that he did not get his way quickly and that Mr. Delahunty blamed this delay on Mr. Newman.
Mrs. Carol Delahunty said she felt that she and her husband were treated unfairly by the Planning Board. She was not sure she had been to any of the meetings on the Jackob's Farm property! She said she was probably at the Pine Street application meeting. From where did she get this impression? The court infers she got this from her husband.
Mr. Delahunty spent a great deal of his direct testimony on the Jackob's Farm/Planning Board matter. From his remarks I conclude as a matter of fact that this property was a hotly contested issue, i.e. what zone of the new Master Plan should the property be designated. However, I could discern nothing improper by members of the Board or by Mr. Newman. Yet, it is clear that this battle was the cause of Mr. Delahunty's animosity towards Mr. Newman; the cause of his concentration on Mr. Newman in the mayoral campaign. (A scrutiny of the "materials" submitted shows no mention of the other candidate and eventual winner Zaboyan!)
Mr. Delahunty denied any animosity towards Mr. Newman. He testified Mr. Newman had it in for him because Mr. Delahunty and his family signed the change of government petition (as did hundreds of others). This petition eventually led to partisan elections in November and Mr. Newman's loss of office. Mr. Newman testified that his campaign strategy was to ignore Mr. Delahunty during the campaign believing him to be insignificant.
Moreover, while there were constant references to delays by the Planning Board, no witnesses, much less an expert, was called to give a time table as to what was normal for a Planning Board application in Brick at this busy time. However, there was testimony that the Board had very crowded agendas and that this was a "boom" time for building in Brick (as it was in all of Ocean County). Lastly, this application was approved according to Mr. Delahunty just before the election!
*507 A perusal of most New Jersey cases on defamation of public figures reveal that most causes of action fail for inadequate proof as to actual malice, i.e. plaintiffs must prove that defendant communicated the defamatory statement to others with actual knowledge that it was false or with a reckless disregard of whether it was true or false.
The Court finds this element has been proven in this case by clear and convincing evidence for the reasons stated herein.
Not only did Mr. Delahunty bear Mr. Newman ill will because of what he perceived to be Newman's manipulation of the Planning Board against him as explained above, and not only did he express these sentiments to his campaign workers (see Herbert Stephens above), but he had reckless disregard for whether the materials distributed were true or false, and I find actual knowledge that he knew some of these charges were false.
As to "reckless disregard" we have the testimony of Peter Ferro, an admitted member of the "Committee To Elect Brian Delahunty." It was clear from his testimony that he and the Delahunty group wanted to put distance between themselves and Mike Miller, (who is said in the publication to be the editor of "The Bricktown Investigator"), and also between themselves and the printing of, content of and payment for the Bricktown Investigator. Peter Ferro's testimony nonetheless was revealing as to the thought process of the "Committee To Elect Brian Delahunty." The court finds that Peter Ferro and Paul Wild were, along with Brian Delahunty, the only members of the committee. From the court's observation of him, CPA Paul Wild appeared to be greatly upset and embarrassed about being involved in this affair. Mr. Wild disclaimed any political discussions with the committee at any time!
At one time Peter Ferro said he "didn't pay much attention to this (referring to Appendix A-C) and then admitted he knew it contained "rumor, hearsay and some lies." He opined that "some of the charges had validity;" "someone obviously believed it was true or they wouldn't have printed it;" "we did not attempt to *508 justify all of the statements in the material;" and "yes, you are allowed to call a politician a crook." What clearer proof can one hope to have as to the knowledge and attitude of the defendant than these words from his main campaign aide?
Peter Ferro did admit his signature on P22 and P23, (delivery tickets for 3,000 and 2,400 copies of Appendix C, "The Brick Investigator"). The owner of Hatteras Press, Robert Duerr testified that Appendix C, an issue of "The Bricktown Investigator", P4 in evidence, was produced by his company, and that the bill for the printing of some 20,000 copies was paid for by a set off against debts his company owed to Ameritel, the company of the Ferros.
Mr. Delahunty and his witnesses tried to distance themselves from these materials by trying to disguise payment for the printing in their filings on campaign expenditures. However, plaintiff's attorney, produced clear and convincing evidence through a trail of receipts, bills and invoices tying this directly to Mr. Delahunty and his brothers-in-law, with payment through Ameritel, the Ferro owned company.
Herbert Stephens, the Delahunty campaign worker with forty years in the printing business, said he would never print these materials because they were too "harsh."
Mr. Delahunty was more circumspect in his testimony. He denied knowing the Mike Miller who worked for Ameritel, who claimed to be the editor of "the Brick Investigator" until confronted with this fact at his deposition; then testified he never discussed the campaign with Mike Miller. (Incidentally, the Delahunty campaign headquarters was the Ameritel offices). He admitted the campaign committee to elect Brian Delahunty consisted of himself, Peter Ferro, Mr. Wild and maybe Anthony Ferro, Jr. He said as to the content of "The Brick Investigator" he looked into some of these things to the best of his ability and "it was not wrong (to distribute these materials) if you believed it was true." Asked what he did to find out if it was true, he answered "I knew the S.C.I. was investigating," "I knew Cierzo tried to shake me down," and "I followed Newman in the town *509 car." (As to the latter item, he said he spent one day following Mr. Newman on his routine; stopping at plumbing job sites as well sites in Brick requiring his attention as Mayor; facts freely admitted by Mr. Newman). Eventually, he admitted he was responsible for what the "committee" put out. All of this more than meets the standards set forth in Dairy Stores, Inc. v. Sentinel Publishing Co., 104 N.J. 125, 152-158, 516 A.2d 220 (1986) and Lawrence, supra, 89 N.J. 451 at 466-469, 446 A.2d 469.
The second "Bricktown Investigator" offered into evidence also contained defamatory statements of fact. See Appendix B. (This was a 8 page hand-out. Only page 6 is reproduced here).
On page six of this edition a bold capital headline declaims "THE TRUTH-Newman's Record." One third of the way down there is a subheadline stating "Voters of Brick Township  The Facts About Newman"; eight items are listed as "fact". The obvious defamatory statements therein are to be discussed. They are:
Fact 1  Newman awarded high priced contracts.
Fact 2  Newman has given high priced vouchers for hundreds of thousands of dollars to his personal friends.
Fact 3  Newman uses his public office for his own personal gain.
Fact 4  Millions of dollars in special tax abatements to his friends in special deals.
Fact 8  Newman has put a $price on everything in Brick Township.
Whether a statement is one of fact is a question of law for the court. Gertz, supra, 418 U.S. at 339-340, 94 S.Ct. at 3006-3007, 41 L.Ed.2d 789; Kotlikoff v. The Community News, 89 N.J. 62, 67, 444 A.2d 1086 (1982).
Each of these five statements of fact, when read along with the allegations of "Corruption" in bold type at the top of the page, are clear expressions of fact that Newman is engaging in illegal *510 conduct while in office. This scenario is similar to Silsdorf v. Levine, 59 N.Y.2d 8, 462 N.Y.S.2d 822, 449 N.E.2d 716 (1983), cert. denied 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983).
In Silsdorf, supra, charges that "it pays to do business with the mayor"; that "plaintiff is profiting in his law practice at the Village's expense"; and that "his administration is corrupt" were statements of fact capable of being defamatory. Id. at 825, 449 N.E.2d at 719. The opinion holds:
Even privilege has its limitations and even a public figure in the midst of a political campaign is entitled to some degree of protection. It is true that our society places a high value on the uninhibited and open debate necessary for the responsible functioning of political processes, to the extent even of protecting some falsity to avoid creating a chilling effect upon that expression (New York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686; Gertz v. Robert Welch, Inc., 418 U.S. 323, 340-341, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 supra). But sufficient protection is afforded defendants by virtue of the requirement that plaintiff prove actual malice (emphasis added).
[Silsdorf, supra, 462 N.Y.S.2d at 827, 449 N.E.2d at 721.]
Thus, Silsdorf bears a similarity to the case at bar and the first element of defamation is found by clear and convincing evidence. Elements two, three, four and five are as set forth above.
The third "Bricktown Investigator" offered into evidence contained defamatory statements of fact. See Appendix C. (This was a 4 page hand-out. Only pages 1 and 3 are reproduced here). This issue contains on the bottom right of page 1 in bold red the headline "NEWMAN'S THUGS ATTACK SENIOR CITIZEN" with a picture beneath it of Anthony Ferro, Sr. taking oxygen. Next to the picture in small letters is "The Whole Truth, Nothing But the Truth on Page 3." On page 3 under the bold red statement in caps is "Newman's Thugs." To charge that Mr. Newman had this man (the father-in-law of Brian Delahunty, a fact not disclosed in the story), beaten is to charge criminal activity and is a defamatory statement of fact. Thus, it is libel per se, see above. Element two is clearly proven since the statement concerns Mr. Newman. As to elements four and five see above. Thus, element three remains to be discussed.
*511 Was this a false statement? Compare the story on page 3, see Appendix C, with Mr. Delahunty's cross examination testimony. He testified that he was at a meeting in Town Hall sitting in the rear of the room. From outside he heard his father-in-law cry out from the direction of the Planning Board. He rushed out to find his father-in-law and others being restrained. An ambulance took his father-in-law to the hospital. (D4 admitted as the hospital bill indicated a diagnosis for hypertension). An attorney, John Doyle, went back to presenting his application before the Planning Board. The only arrest was that of Mike Miller, the same unserved defendant in this case. No connection of this is made to Mr. Newman. Mr. Newman testified he was not at Town Hall that night! No one refuted this. Was Mr. Ferro struck? If so, by whom? Or was he overexcited? (See D4 diagnosis for hypertension). Mr. Delahunty presented no further testimony as to these matters and made no connection to Mr. Newman.
Now if the facts as Mr. Delahunty testified were put into a story without the headlines "Newman's Thugs", if Mr. Ferro's relationship to Mr. Delahunty was given, if no hearsay was used, if you let the reader conclude that Mr. Newman may be behind this, then this story could have an impact and pass constitutional muster as an "expression of opinion" on matters of public concern. However, no such attempt was made. Just the assertion as fact that Newman's thugs beat up a senior citizen complaining about "higher taxes" and trying to "end corruption." This story was clearly designed to injure Newman's reputation, expose him to hatred, contempt and ridicule and have a tendency to injure him not only in his business but as a candidate for office. This is stated as fact not as opinion. The story, besides using poor grammar, is defamatory, false and actionable!

B. THE FLYERS
The flyer, Appendix J, "Justice for Sale" (also reprinted in page 2 of Appendix A) is borderline. "Kick backs for him" is defamatory but in the context is stated as being "if he could" and *512 thus, is protected as opinion. Kotlikoff, supra, 89 N.J. at 68, 444 A.2d 1086 (adopting the Gertz v. Robert Welch Inc. rationale).
As to the Flyer, Appendix D, I find this is a defamatory statement of fact. The legend "Where Your Tax Dollar Really Goes" with a revised dollar bill beneath it (Dan Newman's picture, called a Dan Dollar), with the coins beneath it amounting to one hundred cents. The legends ascribed to the coins I find to be defamatory statements of fact are:
A) Quarter  Newman's Florida Investments;
B) Quarter  Special favors to increase his Pineland Plumbing Business aka Newman Enterprises.
Along with the statement in capital letters at the bottom of the page "End Corruption", these items charge Mr. Newman with taking money from the Brick tax payers through various corrupt schemes which lead to him having Florida investments and getting plumbing business by arranging special favors. This is similar to what the New York Court of Appeals found actionable in Silsdorf v. Levine, supra.
It is clear that elements one and two are proven. That the statements are false was proven by the testimony of Mr. and Mrs. Newman (see above) and the conclusion of the S.C.I. No attempt was made at trial to justify these comments. Mr. Delahunty tried to distance himself from making or publishing this item but distribution was clearly and convincingly proven from the testimony of plaintiff's and defendant's witnesses as set forth in detail above. The discussion of element five as set forth above covers this item as well.

C. THE CARTOONS AS DEFAMATION
No New Jersey case seems to have addressed this aspect of defamation. Cartoons and caricatures have a special place in the history of politics and the law. This was recently declared by the United States Supreme Court in Hustler Magazine v. Falwell, 485 *513 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). The relevant facts of that case were as follows:
The inside front cover of the November 1983 issue of Hustler Magazine featured a "parody" of an advertisement for Campari Liqueur that contained the name and picture of respondent and was entitled "Jerry Falwell talks about his first time." This parody was modeled after actual Campari ads that included interviews with various celebrities about their "first times." Although it was apparent by the end of each interview that this meant the first time they sampled Campari, the ads clearly played on the sexual double entendre of the general subject of "first times." Copying the form and layout of these Campari ads, Hustler's editors chose respondent as the featured celebrity and drafted an alleged "interview" with him in which he states that his "first time" was during a drunken incestuous rendezvous with his mother in an outhouse. The Hustler parody portrays respondent and his mother as drunk and immoral, and suggests that respondent is a hypocrite who preaches only when he is drunk. In small print at the bottom of the page, the ad contains the disclaimer, "ad parody  not to be taken seriously." The magazine's table of contents also lists the ad as "Fiction; Ad and Personality Parody."
[Hustler Magazine v. Falwell, 485 U.S. at 47, 108 S.Ct. at 878, 99 L.Ed.2d 41.]
Hustler recognizes the historical challenges presented by an allegedly defamatory cartoon:
Webster's defines a caricature as "the deliberately distorted picturing or imitating of a person, literary style, etc. by exaggerating features or mannerisms for satirical effect." Webster's New Unabridged Twentieth Century Dictionary of the English Language 275 (2d ed. 1979). The appeal of the political cartoon or caricature is often based on exploitation of unfortunate physical traits or politically embarrassing events-an exploitation often calculated to injure the feelings of the subject of the portrayal. The art of the cartoonist is often not reasoned or evenhanded, but slashing and one-sided. One cartoonist expressed the nature of the art in these words:
"The political cartoon is a weapon of attack, of scorn and ridicule and satire; it is least effective when it tries to pat some politician on the back. It is usually as welcome as a bee sting and is always controversial in some quarters." Long, The Political Cartoon: Journalism's Strongest Weapon, The Quill 56, 57 (Nov. 1962).
Several famous examples of this type of intentionally injurious speech were drawn by Thomas Nast, probably the greatest American cartoonist to date, who was associated for many years during the post-Civil War era with Harper's Weekly. In the pages of that publication Nast conducted a graphic vendetta against William M. "Boss" Tweed and his corrupt associates in New York City's "Tweed Ring." It has been described by one historian of the subject as "a sustained attack which in its passion and effectiveness stands alone in the history of American graphic art." M. Keller, The Art and Politics of Thomas Nast 177 (1968). Another writer explains that the success of the Nast cartoon was achieved "because of the emotional impact *514 of its presentation. It continuously goes beyond the bounds of good taste and conventional manners." C. Press, The Political Cartoon 251 (1981).
Despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate.... From the viewpoint of history, it is clear that our political discourse would have been considerably poorer without them.
[Hustler, supra, 485 U.S. at 55, 108 S.Ct. at 881, 99 L.Ed.2d 41.]
The Court held that any recovery, whether for defamation or intentional infliction of emotional distress, must include as an element of proof that a false statement was made with knowledge that the statement was false or with reckless disregard as to whether or not it was true. See Hustler, supra, 485 U.S. at 55, 108 S.Ct. at 882, 99 L.Ed.2d 41. Furthermore, as to parody, an added element seems to be necessary for an action to succeed, namely, "whether the speech could reasonably be interpreted as stating actual facts about the public figure involved." Hustler, supra, 485 U.S. at 51, 108 S.Ct. at 879, 99 L.Ed.2d 41. Generally cartoon and caricatures are so exaggerated in their comment that the reader cannot take it as being a true statement of fact.
A lack of New Jersey cases on cartoons as defamation led us to the following:
In King v. Globe Newspaper Co., 400 Mass. 705, 512 N.E.2d 241 (1987), cert. denied, 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988), the former Governor of Massachusetts sued the Globe newspaper, two of its columnists and a cartoonist. Summary judgment motions were granted by the trial court. The cartoons involved are printed in the Appendix to that case.
The motions as to the cartoons were upheld as being "artistic rhetorical hyperbole" commenting that the governor was responsible for several ill advised appointments. See King, supra, 512 N.E.2d at 245. It was further stated that "cartoons are seldom designed to disclose facts, but rather are ordinarily understood by reasonable views to be rhetorical, exaggerated means of expressing opinions." Ibid.
*515 Appendix C of that case involved a cartoon as a billboard sign with caricatures of the governor and the president of Ackerley Billboards holding bags of money. The legend says "Ackerley Billboards Can Put Money in Your Pockets Too."
There was an editorial by the same paper that asserts that the billboard industry which has been dying suddenly revived after a $7,000.00 campaign contribution from Ackerley Communications dropped into the Governor's campaign treasury. The Court held:
The billboard cartoon must be viewed as a protected expression of opinion. We do not agree with the plaintiff that the cartoon depicts him "accepting cash bribes ... in return for his support of the efforts of Ackerley Communications." Rather, we agree with the judge that "[t]he alleged facts figuratively conveyed by the cartoon (that the plaintiff and Locke received personal cash contributions and/or payoffs from Ackerley) simply do not flow from a form of expression that clearly draws upon overstatement and extravagant symbolism to make its point. The cartoon implies nothing more than Szep's editorial judgment that the plaintiff's association with Ackerley raised questions of public concern.
[King, supra, 512 N.E.2d at 246.]
The interpretation of the cartoon was aided by the accompanying editorial, which was found to be an expression of opinion protected by the Gertz v. Robert Welch Inc. rationale.
The case of Celebrezze v. Dayton Newspapers Inc., 41 Ohio App.3d 343, 535 N.E.2d 755 (1988) involved a suit by a State Supreme Court judge who sued the newspaper over a cartoon that ran during the judge's campaign for reelection. (The cartoon is reprinted as an appendix to the case 535 N.E.2d at page 760).
The cartoon shows an automobile bearing the judge's name on its license plate carrying a machine gun firing at passengers at a store front with the sign overhead "Ohio Bar Association" and a doubled over man in front of the doorway as if just shot, another shot man in the gutter and a skunk sitting on the curb.
Summary judgment dismissing the claim below was affirmed with these words:
One element of a cause of action for libel is that the defamatory publication be an assertion of a fact. There is no such assertion here. No reasonable person could conclude from viewing Priggee's cartoon that he was accusing Celebrezze of the criminal act of murder or attempted murder. The scene depicted was exaggeration, *516 hyperbole, much as in Matalka v. Lagemann (1985) 21 Ohio App.3d 134, 21 OBR 143, 486 N.E.2d 1220, where one cartoon portrayed the presiding officer of the city council as an auctioneer selling off the council vote to the highest bidder, and another cartoon portrayed council as a prostitute willing to sell her favors. The decision in Matalka, supra, relied on Greenbelt Coop. Publishing Assn., Inc. v. Bresler (1970), 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6, which characterizes these types of expressions as "rhetorical hyperbole" and "a vigorous epithet * * *." Id. at 14, 90 S.Ct. at 1542. The cartoon in this case was likewise rhetorical, perhaps allegorical, but not capable of being interpreted as being factual or defamatory. Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789.
[Celebrezze, supra, 535 N.E.2d at 758.]
We review the cartoons in light of these standards and search for whether the cartoons assert facts or opinion.
Appendices E, F, H, I can be taken together. Each of these contains those elements of exaggeration, hyperbole and obvious overstatement. Each requires the observer to read in a great deal of his own facts and opinions to gather the theme of the cartoon. For example, as to Appendix E, without more one cannot conclude the deeds in the belt of the colossal figure represent an allegation of corrupt money used to buy out of state properties. (Charges which are false as proven above). This and the others are no more than exaggerated hyperbolic opinion.
Appendix G is different. Here the message is plain. One figure standing before a store having an "Opening" sign in its window. "Spring 1988" is slashed. "Fall 1988" is slashed. Spring 1989 remains. A figure in front (the owner) says "Hey Joe How'd you get your stores up so fast  Site Plan, Town Council Approvals, Building Permits, Inspections and C.O. I applied a year ago and I'm still waiting."
On the right side of the cartoon is another store with Grand Opening announced and banners flying. A portly figure with drooping mustache and thick glasses stands next to a truck with lettering (PL or P1) visible on its side. (This represents an exaggerated Newman).
*517 A figure opposite the "owner" replies "Its fast and easy in Brick! Just use Pineland Plumbing. The Mayor owns the company."
In a second comment, this figure, holding a brief case says, "Comming [sic] Dan." "I've got it here."
It takes very little local knowledge and imagination to conclude what the point here is: use Mayor Dan Newman's plumbing company and he will use his influence to get your store approvals and a certificate of occupancy.
This is a not so subtle return to the theme that Mr. Newman is corrupt.
Is this a statement of fact or is it opinion? We apply the principles stated in Gertz, supra, and more recently in Ward, supra, (involving an oral statement at a condominium meeting discussing the concept of verifiability as it relates to opinion versus fact). "Unless a statement explicitly or impliedly rests on false facts that damage the reputation of another, the alleged defamatory statement will not be actionable.... [O]nly if ... it suggested specific factual assertions that could be proven true or false could the statement qualify as actionable defamation." Id. at 531, 643 A.2d 972. There is no opinion stated in this cartoon. The message is simply this, pay off Newman by using his plumbing company or with money from the brief case and he will grease the approval process at Town Hall.
In essence, then, I find cartoon, Appendix G, to be another charge of corruption. As the explanation of this charge has been covered completely in discussion of "The Bricktown Investigator", (Appendix A-C), each of the necessary elements has been found to exist and thus, this cartoon is defamatory fact, concerns the plaintiff (the cartoon uses his name "Dan", a caricature that is consistent with others depicting Dan Newman, and refers to "Pineland Plumbing", "the Mayor owns the company"), charges of corruption have been proven false (see P3 and refer to the testimony of Mr. and Mrs. Newman), there has been communication *518 and there has been proven reckless disregard and/or knowledge of falsity. See above.

VI. THE "COUNTERSUIT"
This pleading filed by Mr. Delahunty on March 25, 1992 contained five counts. The only proofs offered as to any defamation of Mr. Delahunty came during Mr. Delahunty's testimony.
He stated that in a May 1989 Asbury Park Press article, Mr. Newman called him a builder developer who is trying to rip off and rape the Township of Brick. The article, D21, was marked into evidence.
Applying the five elements set forth and discussed above, this statement must fail as defamation for the following reasons: it is a statement of opinion not of fact; there is no proof that it was communicated with actual knowledge of its falsity or with reckless disregard; and there was no proof that this was actually stated by Mr. Newman.
In a similar vein was the article from the Observer newspaper of September 16, 1989, D44, in which it was alleged that Mr. Newman compared Mr. Delahunty's action to those of a "Columbian Drug Lord". This is clearly opinion. No reasonable man would in the context accept this as a statement of fact charging Delahunty with being a Columbian drug lord. Nor is there any proof that this was an actual and accurate statement by Mr. Newman. The comment in the article does not even have quotation marks around it.
Thus, for the law as expressed in Kotlikoff, supra, 89 N.J. at 68-73, 444 A.2d 1086, these are statements of opinion and not defamatory.

VII. DAMAGES
At the outset of trial, it was noted that the principles of Herman v. Sunshine Chemical Specialties, Inc., 133 N.J. 329, 627 A.2d 1081 (1993) would be followed and thus no proofs as to punitive *519 damages would be taken during the trial. The complaint never sought "compensatory damages."
It would have been difficult to prove any compensatory damages in this factual setting. To conclude that because of these defamatory attacks Mr. Newman lost the election would have been speculative. To attempt to prove loss of profits from the plumbing business in an economy that has been less than robust for the building business in Ocean County would have been futile as the law requires loss of profits to be proven with specificity. J.L. Davis & Associates v. Heidler, 263 N.J. Super. 264, 276-277, 622 A.2d 923 (App.Div. 1993).
There was some testimony as to emotional distress both from Mr. and Mrs. Newman.
Mr. Newman testified that during the campaign these materials had an effect on him; that he did not have a desire to go out campaigning and suffer the abuse that was being directed to him. Thus, he avoided some campaign events and some social events.
Mrs. Newman testified that Mr. Newman did not sleep well, she would see him late at night at the kitchen table contemplating one of the materials and shaking his head in dismay and disgust.
Mrs. Newman also testified that she was involved in fifteen election campaigns and this was the most bitter. These materials had an effect on her and the whole family, (their daughter, a school teacher, was confronted with these materials by her students), and she also felt no desire to continue former social and civic activities during and after the election.
Nonetheless, it has long been the law in New Jersey that in slander per se actions (for instance, when the plaintiff is charged with theft), the plaintiff need not prove "special damages" i.e. compensatory damages. Hall v. Heavey, 195 N.J. Super. 590, 594-597, 481 A.2d 294 (App.Div. 1984).
Therefore, the Court found nominal damages in the sum of $1,000.00 and declared that under the circumstances that punitive damages would be awarded.

*520 PUNITIVE DAMAGES

Following the precepts set forth in Herman, supra, the parties were advised at the outset of trial that evidence as to punitive damages would be submitted if, and after, a verdict was entered as to liability. The trial ended on June 28, 1994.
The attorney for the plaintiff asked for additional time to present evidence as to punitive damages and to do discovery, (apparently testimony from defendant and his partners about ownership of the Jackob Farm tract was in conflict with information plaintiff's counsel had). Thus, I allowed some forty-five days. The defendant later moved for additional time and answers to certain interrogatories. I allowed the answers but kept August 15, 1994 as the firm date for continuing and ending the trial.
Herman, supra, establishes parameters for the award of punitive damages. The following factors are to be considered: (1) there should be a reasonable relationship to the actual injury; (2) defendant's financial condition, i.e. the ability to pay, which makes sense from both the deterrence aspect and the punishment aspect (twin goals to be achieved in awarding punitive damages); and (3) the plaintiff's litigation expense. Factor four, punishment from other sources, would seem to relate to possible criminal punishment, not relevant here. Factor five, profits that defendant made by his conduct, is apparently a Corvair like products liability situation e.g. how much money did General Motors earn by not putting the gas tank within the frame of the car?
N.J.S.A. 2A:58C codifies criteria for punitive damages in products liability cases. It adds to the above factors a focus on the defendant's awareness of the harm being caused and the tortfeasors actions after awareness of the harm caused and the duration of the conduct.
Fischer v. Johns  Manville Corp., 103 N.J. 643, 655, 512 A.2d 466 (1986), focuses on whether the wrongdoer's conduct is "especially egregious." The case repeats earlier sentiments that the punitive damages serve "to express the community's disapproval *521 of outrageous conduct." Id. at 657, 512 A.2d 466. Hustler, supra, condemned false statements of fact. "False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counter-speech, however persuasive or effective." Hustler, 485 U.S. at 48, 108 S.Ct. at 880, 99 L.Ed.2d 41 (citing Gertz 418 U.S. at 340, 344, n. 9, 94 S.Ct. at 3007, 3009, n. 9).
Considering these precepts and applying them to the facts in this case, Mrs. Newman was eloquent in conveying the sense of outrage and helplessness that these attacks had upon the entire Newman family and Mr. Newman in particular. Mr. Newman could not campaign with vigor and avoided certain situations and opportunities. This testimony establishes a real injury with manifestations of suffering just as if Mr. Newman had been injured in an automobile accident and remains with a "psychic overlay." The harm and damage lasted throughout the campaign and continues.
As William Shakespeare said of reputation some four hundred years ago:
Iago. Good name in man and woman, dear my lord,
Is the immediate jewel of their souls:
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed. (emphasis added).
[William Shakespeare, Othello, Act III Scene III, Iago to Othello, lines 155-161 (A.L. Rouse, 1st ed., 1978).]
It is difficult to restore a good name once it has been damaged. Thus, it is arguable that Mr. Newman can never fully recover from the harm, so in a sense then his injury and damage is to be considered permanent.
I find the persistent conduct of Mr. Delahunty to be outrageous; that Mr. Delahunty showed no restraint with regard to the material he distributed; that he made little or no attempt to *522 distinguish fact from rumor and seems to have invented material. He had no consideration for the harm that he would inflict with his malicious misstatements of fact. Such conduct, if it goes unpunished, would deter good people from participating in the political process. See Eldredge "The Law of Defamation" (1978), cited above at page 498, 681 A.2d at 674.
At the trial on August 15, 1994, Mr. Newman's attorney presented Mr. Delahunty's income tax returns over several years. He also presented evidence relating to partnership interests in real estate holdings having substantial value. The Jackob's Farm tract is listed for sale at $1.3 million. I find Mr. Delahunty has a 25% interest in that property as well as others (one property has a $198,000.00 contract on it at present). While it is difficult to ascertain the present market value of all but the property that has a contract, it is clear that he has substantial equity in real estate. It is also clear from other testimony that he has capacity to earn money as a builder and in other fields as well. In fact his talent and demonstrated intelligence makes his actions in this case all the more sad. Mr. Delahunty raises a smoke screen as to various outstanding debts, many of which are owed to his mother and are unsupported by legal instruments of debt. The Court does not believe it must make a definite finding as to his exact net worth in order to assess punitive damages. To find he has assets of substance and the capacity to earn a comfortable living is sufficient. Mr. Delahunty has also made several transfers of property from joint names to his wife's name. These may require future scrutiny.
Therefore, having in mind all of the above and especially considering that this is not an isolated instance of defamation, but a course of conduct with five separate instances of defamation, (Appendicies A, B, C, D and G); I enter an award of $200,000.00 to Mr. Newman to redress the harm suffered, to deter future conduct of this nature and to punish Mr. Delahunty for the persistent outrageous conduct.
*523 To this I add the sum of $1,000.00 and the sum of $13,388.49 which I find to be the reasonable and necessary legal fees expended by Mr. Newman to vindicate his good name; making a total award of $214,388.49 nominal and punitive damages, plus interest as provided by the Rules of Court.
*524 
*525 
*526 
*527 
*528 
*529 
*530 
*531 
*532 
*533 
*534 
NOTES
[1] The original trial opinion contained all of the publications alleged to be libelous. This opinion for the sake of brevity eliminates several of the publications found not libelous.
[2] The Jackob's Farm subdivision is discussed at length at p. 504 infra.
[3] This cartoon is Appendix E.